(43 App. Div. 108.)

KUHN v. HEMMANN et al.

(Supreme Court, Appellate Division, First Department. July 18, 1899.)

1. ALIENATING HUSBAND'S AFFECTIONS.

A wife may maintain an action against one who has enticed her husband from her, or deprived her of the comfort of his society.

2. SAME—EVIDENCE.

Evidence that defendants enticed plaintiff's husband, who at the time was living with her, to send her to Europe to get her out of the way, in order that a divorce might be obtained, so that the husband might marry their daughter, with whom he had kept up an adulterous intercourse, and that they furnished him with money to send her to Europe, and connived at and encouraged a subsequent bigamous marriage between him and their daughter, is sufficient to sustain an action for damages for alienating the affections of the husband.

Van Brunt, P. J., and Ingraham, J., dissenting.

Appeal from trial term, New York county.

Action by Marie Kuhn against Friedhold Hemmann and another. Judgment for defendants, and plaintiff appeals. Reversed.

The action was brought to recover damages for alienation of the affections of plaintiff's husband by the defendants. Plaintiff was married to Charles Kuhn in 1890, and in 1892 they moved to an apartment house where the defendants, who were the owners, resided. The defendants' daughter, Elsie Hemmann, resided with them, and in 1893 Kuhn commenced an adulterous intercourse with this daughter. Discovering in May, 1894, that she was in a delicate condition, he took her to an apartment house on Fifty-Sixth street, where a child was born to them in July, 1894. The defendant Barbara Hemmann frequently visited them at this place, and they were known there as Mr. and Mrs. Kuhn. In 1895 and 1896 they lived together as man and wife in a house on Seventy-Seventh street, and, while living there, were frequently visited by both defendants. At the time of the birth of the child above referred to, defendant Barbara Hemmann said to the midwife, who was commiserating her on her daughter's unfortunate predicament: "No matter, it may come out

all right, may be she takes money, and goes away, and he can marry her then."
In 1894 Charles Kuhn, in the presence of Friedhold Hemmann, referred to him
as his father-in-law, and Hemmann at other times spoke of Kuhn in the same
year as his son-in-law, and of his daughter Elsie as Kuhn's wife. During all
this time, and up to the date when she left for Europe, in 1896, the plaintiff
was living with her husband in the same house with the defendants, on good
terms with them, but was entirely ignorant of the circumstances above referred
to. Her husband was earning a good salary, and he was her sole support.
She knew of Elsie Hemmann's condition, but had been told by both defendants
that a man named Heckman was responsible therefor. She knew nothing of
her husband's infidelity until her return from Europe, in 1896. Admissions
of Friedhold Hemmann were proved to the effect that he furnished money to
Kuhn to send the plaintiff to Europe, and that he promised to pay all the cost
of divorce proceedings, and to set him up in business, if he would marry his
daughter. It was also shown that, shortly after the departure of the plaintiff
for Europe, both defendants stated to friends of hers, who had ascertained the
true situation, that she "was not worth to have a man like this," and that it
was "a pity such a fine, elegant man should be married to such a common,
ordinary woman." Within a short time after plaintiff's departure, Kuhn and
Elsie Hemmann moved into the house adjoining the defendants', which was
also owned by them, and a few months later into the very apartments in the
defendants' house formerly occupied by the plaintiff and Kuhn; and they lived
there as man and wife. In May, 1896, and while plaintiff was still in Europe,
and in ignorance of all these facts, Kuhn and Elsie Hemmann went through
a marriage ceremony, which was performed by a Lutheran minister who had
been for many years a personal friend of the defendant Friedhold Hemmann.
The latter accompanied them, and, when the clergyman (who relied solely upon
Hemmann's word), inquired whether Kuhn had been divorced with a right to
remarry, he replied that "it was all right." Hemmann also signed the mar-
riage certificate as a witness. On the same day the child was baptized by a
minister of another denomination. Plaintiff returned from Europe shortly
after this, and found Elsie Hemmann living as Mrs. Kuhn in the apartments
which had been occupied by Kuhn and herself when she went away. Charles
Kuhn had then disappeared.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY,
PATTERSON, and INGRAHAM, JJ.

Isidore Hershfield, for appellant.
Frederick H. Ernst, for respondents.

BARRETT, J. It is well settled that a wife may maintain an
action against one who has enticed her husband from her, or de-
prived her of the comfort of his society. Bennett v. Bennett, 116
N. Y. 584, 23 N. E. 17; Jaynes v. Jaynes, 39 Hun, 40; Baker v.
Baker, 16 Abb. N. C. 293; Breimann v. Paasch, 7 Abb. N. C. 252;
Westlake v. Westlake, 34 Ohio St. 621. The defendants evidently
misconceive the nature of the present action, for they contend that
it cannot be successfully maintained, because of a lack of evidence
to show that they had any knowledge of the improper relations ex
isting between their daughter and plaintiff's husband until the child
was born. They also assume that the entire wrong to the plaintiff
was consummated when Kuhn entered upon his adulterous life with
Elsie Hemmann, and that no act of theirs subsequent thereto could
add to the plaintiff's injury. They insist that the plaintiff's only
remedy is a possible action for damages against their daughter.
Their contention overlooks the fact that this action is not to re-
cover damages sustained by the plaintiff as a result of the criminal
conversation of her husband with Elsie Hemmann, but for the loss

of consortium. This is plainly the gravamen of the complaint. The damages claimed are alleged to have been sustained by reason of the plaintiff's deprivation, resulting from the defendants' acts and inducements, of the "comfort, aid, assistance, affection, support, and maintenance" of her husband. Mere marital infidelity would not suffice to maintain such an action, for marital infidelity alone did not cause the wrongs of which the plaintiff is now complaining. There is no evidence whatever to show that she was in any way deprived of the "comfort, society, aid, assistance, affection, support, and maintenance" of her husband up to the time when she left for Europe. It is true that he was then, and had been for some time previous thereto, maintaining a mistress, with whom he passed a portion of his time. But of this the plaintiff was in complete ig- norance. He still continued to live with and support her; and he ostensibly fulfilled all his marital relations. It is clear, then, that there was up to this time no such alienation of affections as would have entitled the plaintiff to maintain an action like the present against these defendants. Romaine v. Decker, 11 App. Div. 22, 43 N. Y. Supp. 79; Buchanan v. Foster, 23 App. Div. 544, 48 N. Y. Supp. 732; Hodecker v. Strickler (Sup.) 39 N. Y. Supp. 515, affirmed in 20 App. Div. 245, 46 N. Y. Supp. 808. Thus the only injury which plaintiff suffered up to the time of her departure for Europe was the moral injury resulting from the violation of her husband of his marital allegiance. It is for the additional wrong which the defend- ants subsequently caused to be inflicted upon her that she brings this action. This additional wrong consisted in the entire abandon- ment of the plaintiff by Kuhn, his entering into a bigamous mar- riage with the defendants' daughter, and his taking the latter to the very apartments in the defendants' house which he had pre- viously occupied with the plaintiff. This was the loss of the "com- fort, society, aid, assistance, affection, support, and maintenance" complained of by the plaintiff; and that loss, and the defendants' responsibility therefor, were sufficiently shown, at least prima facie. The plaintiff was living with her husband in apparent peace and contentment up to the time of her departure for Europe. Some time previous thereto the defendants talked of taking steps to get her out of the way. This was because of Kuhn's relations with their daughter, of which they were fully aware. Their admissions were given in evidence to the effect that they had told Kuhn that they would pay for a divorce, and set him up in business, if he would marry their daughter; and that they furnished him the money to send the plaintiff to Europe to get her out of the way. It was proved, too, that they connived at and encouraged the bigamous marriage with their daughter. We also find that they freely told various people that they considered Kuhn's lawful wife a common woman, much beneath him, and that they were doing all in their power to separate him from her. How well they succeeded has al- ready been shown. If they had taken no steps at all in the mat- ter, Kuhn might never have wholly abandoned his wife. At any rate, there was enough evidence to warrant the inference that they induced Kuhn to send her to Europe, with the idea of eventually

getting rid of her entirely, and that by their influence and inducements they finally accomplished this latter purpose. Upon all the testimony it was certainly a question for the jury whether their wrongful influence and inducements were the cause of Kuhn's finally abandoning the plaintiff. Remsen v. Hay, 14 Wkly. Dig. 443. They cannot escape the consequences of their acts upon the plea of parental solicitude. While we may sympathize with them as parents, we cannot justify the means which they adopted to effect a partial rehabilitation of their daughter at the expense of an innocent wife.

The judgment should be reversed, and a new trial ordered, with costs to the appellant to abide the event.

RUMSEY and PATTERSON, JJ., concur. VAN BRUNT, P. J., and INGRAHAM, J., dissent.